UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMAR SINGH, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>HANS G.C.P. SCHIKAN, BERNDT A.E. MODIG, GILES V. CAMPION, COLLEEN A. DEVRIES, LUC M.A. DOCHEZ, RÉMI DROLLER, DAAN ELLENS, PETER GOODFELLOW, MARTIJN KLEIJWEGT, DAVID MOTT, PATRICK VAN BENEDEN, J.P. MORGAN SECURITIES LLC, CITIGROUP GLOBAL MARKETS INC., LEERINK SWANN LLC (N/K/A LEERINK PARTNERS LLC), WEDBUSH SECURITIES INC., KBC SECURITIES USA, INC., TROUT CAPITAL LLC, and PROSENSA  HOLDING N.V.,<br><br>Defendants. | Case No. 1:14-cv-05450-NRB<br><br><br><br><br><br>**DEMAND FOR JURY TRIAL** |

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS**

Lead Plaintiff Patricia Voit and plaintiff Amar Singh ("Plaintiffs"), by their undersigned attorneys, allege the following based upon the investigation conducted by Plaintiffs' counsel. The investigation included, among other things, a review of United States Securities and Exchange Commission ("SEC") filings by Prosensa Holding N.V. ("Prosensa" or the "Company"), as well as regulatory filings and reports; securities analysts' reports and advisories about the Company; press releases, earnings calls, and other public statements issued by Prosensa; and media reports about Prosensa.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.      This is a class action on behalf of all persons and/or entities who purchased or otherwise acquired the ordinary shares of Prosensa pursuant and/or traceable to the Registration Statement and Prospectus (collectively, the "Registration Statement")[1] issued in connection with the Company's initial public offering ("IPO") on or about June 28, 2013, seeking to pursue remedies under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act").

2.      Prosensa is a biotechnology company based in Leiden, Netherlands.  The Company is engaged in the discovery and development of ribonucleic acid-modulating (or "RNA"-modulating) therapeutics for the treatment of genetic disorders.  Prosensa focuses on rare neuromuscular and neurodegenerative disorders with a large unmet medical need, including Duchenne muscular dystrophy ("DMD"), myotonic dystrophy, and Huntington's disease.

---

[1]     The Registration Statement also refers to, collectively, the registration statement that was filed by the Company with the SEC on Form F-1 on or about March 24, 2013, all amendments thereto, and the prospectus, which formed a part of the Registration Statement and became effective on or about June 27, 2013.

3.      Prosensa's clinical portfolio of RNA-based product candidates is focused on the treatment of DMD.  DMD is one of the most prevalent rare genetic diseases globally, affecting up to one in 3,500 boys and is invariably fatal.  There is currently no approved disease-modifying therapy for DMD.  The disease is characterized by progressive muscle-wasting or muscular atrophy that is caused by inadequate production of dystrophin, a protein necessary for muscle function, as a result of mutations in the dystrophin gene.

4.      At the time of the IPO, Prosensa's first and lead DMD drug product candidate was drisapersen, which Prosensa was developing in collaboration with GlaxoSmithKline ("GSK"), forming a partnership with them in October 2009.  Prosensa claimed that drisapersen could address a variety of mutations in the dystrophin gene.  According to the Company, drisapersen aims to restore dystrophin expression and improve muscle condition and function in the largest known sub-population of DMD patients.

5.      However, Prosensa's drisapersen was not the only experimental drug designed to treat DMD through the same methodology in clinical trials.  Sarepta Therapeutics Inc.'s ("Sarepta") (formerly known as AVI BioPharma) drug, eteplirsen, was also in clinical trials at the time of Prosensa's IPO, and as acknowledged in Prosensa's Registration Statement, is the Company's key DMD competitor utilizing a near identical approach to treating DMD.

6.      In fact, both Prosensa and Sarepta were racing one another for approval in the United States and Europe - and with it pole position to the untapped billion-dollar worldwide DMD drug market.  Given Prosensa's rich collaboration with GSK and Prosensa's own looming IPO from which it hoped to raise tens of millions of dollars, it was vital for Prosensa's financial prospects to have drisapersen reach the market prior to Sarepta's eteplirsen.

7.      In September 2010, the Company commenced a Phase II placebo-controlled study (also referred to herein as the "DEMAND-II" study) of drisapersen in fifty-three DMD patients, for which the abbreviated results were first presented at a conference on April 11, 2013. According to the Registration Statement, the results from the DEMAND-II study demonstrated a statistically significant and clinically important difference in the primary endpoint, which was the distance walked in the six minute walk test (or "6MWD") between the placebo group and the continuous active-treatment group at a dose of six mg/kg/week after twenty-four weeks.

8.      Thereafter, the Company commenced its pivotal Phase III study (also referred to herein as the "DEMAND-III" study) of drisapersen in December 2010, with the results expected to be announced in the fourth quarter of 2013 – just following Prosensa's IPO.  According to the Company, the study was a randomized, double-blind[2] and placebo-controlled trial, assessing drisapersen at a dose of six mg/kg/week in 186 boys and the primary endpoint was the 6MWD at 48 weeks.

9.      In order to quickly populate the DEMAND-III study (and stay ahead of the competition), the Company drastically lessened the enrollment criteria for the study (as compared to that of the DEMAND-II study).  For example, the DEMAND-II study only enrolled boys capable of standing up from the floor in seven seconds or less, whereas the DEMAND-III study had no maximum time for standing up.  The lessening of the enrollment criteria resulted in the subject children being older and having more advanced DMD than those subjects in the DEMAND-II study.

---

[2]      Double-blind studies are utilized to prevent bias in research results.  Such studies are particularly useful for preventing bias due to demand characteristics or the placebo effect.  The placebo effect decreases the reliability of clinical studies because patients who know they are receiving the drug treatment are psychologically motivated to perform better while patients receiving the placebo have no such motivation.

10.     Indeed, prior to the Company's IPO, the results of studies became public regarding the natural history of DMD.  These natural history studies, of which the Company was aware and a discussion of which was included in IPO Registration Statement and Prospectus,[3] demonstrated that the younger boys' (age 7 and younger) baseline walking ability remains relatively strong, and these younger boys typically gain motor function with the passage of time through simple growth even without treatment.  In contrast, it is with boys older than 7 years old with DMD that walking ability greatly decreases, especially as compared to boys without DMD.

11.     Aside from populating DEMAND-III with older patients, and in its rush to expedite the enrollment and completion of the DEMAND-III clinical study, the Company also utilized varied locations and new testing sites.  In fact, the DEMAND-III study was conducted at 44 centers in 19 countries (compared to the DEMAND-II study which was conducted at only 13 centers).  This likewise compromised the DEMAND-III study as it led to, among other things, unfamiliarity with study protocol and inconsistent application of study protocol.

12.     On June 27, 2013, the precipice of the Prosensa IPO, GSK announced that the United States Food and Drug Administration ("FDA") had verbally granted it "breakthrough therapy designation," meaning drisapersen would receive a quicker FDA review and processing because the illness the drug was intended to treat is life-threatening.  Prosensa, of course, scrambled to include this news in the Registration Statement.

13.     On June 27, 2013, the SEC declared the Company's Registration Statement effective.

---

[3]     While the Company discussed the natural history of the disease, the Company failed to discuss the implication of the diseases natural history on the DEMAND-III study and the potential approval of drisapersen.

14.     On June 27, 2013, the Company priced the IPO, which closed on or around July 8, 2013.  In connection with the IPO, Prosensa sold more than 6.9 million ordinary shares (including 900,000 ordinary shares pursuant to overallotment options issued to the Company's underwriters) to the public for $13 per share, generating net proceeds of $89.7 million.

15.     As detailed more fully herein, the Registration Statement contained materially false and/or misleading statements and/or omitted material information required to be stated therein concerning the development status of drisapersen, the DEMAND-III study, the prospects for drisapersen's regulatory approval, and the future commercial prospects of drispersen. Specifically, the Registration Statement failed to disclose the following: (1) the enrollment criteria for DEMAND III had been *substantially* relaxed (compared to the enrollment criteria for the DEMAND II study) to enable quicker enrollment in order to, among other things, keep up with the progress being made by Prosensa's main competitor in the race to get a viable DMD drug to the market; (2) the Company utilized varied locations and new testing sites in order to expedite the enrollment and completion of the DEMAND III clinical study, leading to unfamiliarity with study protocol and inconsistent application of study protocol; (3) the DEMAND-III clinical study was flawed due to its relaxed enrollment criteria, which populated the clinical study with older, lower performing patients suffering from more advanced signs of DMD, compromising the results of the DEMAND-III clinical study; (4) that due to the significantly different patient populations in the DEMAND-II and DEMAND-III studies, comparisons of the two clinical studies would be rendered unreliable, compromising the ability to advance the approval prospects of drisapersen; and (5) in light of the forgoing, Defendants lacked a reasonable basis for their positive statements concerning the development status of

drisapersen, the DEMAND-III study, the prospects for drisapersen's regulatory approval, and drisapersen's future commercial prospects.

16.     On September 20, 2013, *less than three months after the IPO*, the Company issued a joint press release with GSK, disclosing that drisapersen had not met the primary endpoint in the DEMAND-III study.  According to the Company and GSK, "[t]here was no treatment difference in key secondary assessments of motor function: 10-meter walk/run test, 4-stair climb and North Star Ambulatory Assessment."

17.     The market reaction to this news was severe as the Company's stock declined $16.86 per share, approximately 70%, on unusually heavy trading volume, to close on September 20, 2013 at $7.14 per share.

18.     Shareholders were not the only ones left scratching their heads.  On September 24, 2013, J.P. Morgan issued an analyst report downgrading Prosensa from an overweight rating to a neutral rating while stripping its price target down from $35 *to just $6.50*.  In downgrading the stock, the September 24, 2013 J.P. Morgan analyst report specifically addressed flaws in the DEMAND-III clinical study, expressed dismay with respect to the overly broad patient enrollment and the "unfortunate" decision to relax the enrollment criteria for the DEMAND III study.

19.     No one, however, said it better than CEO Schikan who admitted that the "*Phase III trial may have failed the drug, rather than the drug failing the trial.*"

## JURISDICTION AND VENUE

20.     The claims asserted herein arise under Sections 11 and 15 of the Securities Act (15 U.S.C. §77k and §77o).

21.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, (15 U.S.C. §77v) and 28 U.S.C. §1331.

22.     Venue is proper in this Judicial District pursuant to Section 22 of the Securities Act (15 U.S.C. §77v) and §28 U.S.C. §1391(b).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  One or more defendants maintain offices or conduct business within this Judicial District.  Additionally, at times relevant hereto, Prosensa's stock traded on the NASDAQ Global Select Market exchange.

23.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

24.     Lead Plaintiff Patricia Voit purchased Prosensa common shares pursuant and/or traceable to the Company's Registration Statement and was damaged thereby, as is described in the Certification previously filed on September 16, 2014 and incorporated herein.  (Docket No. 11, Exhibit C).

25.     Plaintiff Amar Singh purchased Prosensa common shares pursuant and/or traceable to the Company's Registration Statement and was damaged thereby, as is described in the Certification previously filed on July 18, 2014 and incorporated herein.  (Docket No. 1).

26.     Defendant Hans G.C.P. Schikan ("Schikan"), at all relevant times, was Prosensa's Chief Executive Officer and a Management Board Director.  Defendant Schikan signed or authorized the signing of the false and misleading Registration Statement.

27.     Defendant Berndt A.E. Modig ("Modig"), at all relevant times, was Prosensa's Chief Financial Officer.  Defendant Modig signed or authorized the signing of the false and misleading Registration Statement.

28.     Defendant Giles V. Campion ("Campion") was, at all relevant times, Prosensa's Chief Medical Officer, Senior Vice President of Research and Development, and a Management Board Director.  Defendant Campion signed or authorized the signing of the false and misleading Registration Statement.

29.     Defendant Colleen A. DeVries ("DeVries") served, at all relevant times, as Prosensa's Senior Vice President of National Corporate Research, Ltd. and as, according to Prosensa's Registration Statement, the Company's "Authorized Representative in the United States."  Defendant DeVries signed or authorized the signing of the false and misleading Registration Statement.

30.     Defendant Luc M.A. Dochez ("Dochez"), at all relevant times, was Prosensa's Chief Business Officer, Senior Vice-President of Business Development, and a Management Board Director.  Defendant Dochez signed or authorized the signing of the false and misleading Registration Statement.

31.     Defendant Rémi Droller ("Droller") was, at all relevant times, a member of the Prosensa Supervisory Board.  Defendant Droller signed or authorized the signing of the false and misleading Registration Statement.

32.     Defendant Daan Ellens ("Ellens"), at all relevant times, was a member and Chairman of the Prosensa Supervisory Board.  Defendant Ellens signed or authorized the signing of the false and misleading Registration Statement.

33.    Defendant Peter Goodfellow ("Goodfellow") was, at all relevant times, a member of the Prosensa Supervisory Board.  Defendant Goodfellow signed or authorized the signing of the false and misleading Registration Statement.

34.    Defendant Martijn Kleijwegt ("Kleijwegt") was, at all relevant times, a member of the Prosensa Supervisory Board.  Defendant Kleijwegt signed or authorized the signing of the false and misleading Registration Statement.

35.    Defendant David Mott ("Mott") was, at all relevant times, a member of Prosensa's Supervisory Board.  Defendant Mott signed or authorized the signing of the false and misleading Registration Statement.

36.    Defendant Patrick Van Beneden ("Van Beneden") served, at all relevant times, as a member of the Prosensa Supervisory Board.  Defendant Van Beneden signed or authorized the signing of the false and misleading Registration Statement.

37.    Each of the persons listed in ¶¶26-36 are collectively referred to herein as the "Individual Defendants."  Each of the Individual Defendants either signed or authorized the signing of the defective Registration Statement and, as such, is liable under the Securities Act.

38.    Defendant J.P. Morgan Securities LLC ("J.P. Morgan") served as an underwriter to Prosensa in connection with the IPO.

39.    Defendant Citigroup Global Markets Inc. ("Citigroup") served as an underwriter to Prosensa in connection with the IPO.

40.    Defendant Leerink Swann LLC ("Leerink") served as an underwriter to Prosensa in connection with the IPO.[4]

---

[4]    On or about January 6, 2014, Leerink announced that it changed its name to Leerink Partners LLC "as part of a rebranding initiative."

41.     Defendant Wedbush Securities Inc. ("Wedbush") served as an underwriter to Prosensa in connection with the IPO.

42.     Defendant KBC Securities USA, Inc. ("KBC") served as an underwriter to Prosensa in connection with the IPO.

43.     Defendant Trout Capital LLC served as an underwriter to Prosensa in connection with the IPO.

44.     These defendants described in ¶¶38-43 are collectively referred to herein as the "Underwriter Defendants."   The Underwriter Defendants participated in the drafting and dissemination of the Registration Statement and received substantial compensation in connection with the IPO.   The Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters and were negligent in failing to ensure that the Registration Statement for the IPO was prepared properly and accurately.   The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.   As such, each is liable under the Securities Act.

45.     Defendant Prosensa is organized under the laws of the Netherlands and is headquartered in Leiden, Netherlands.  Prosensa is a biotechnology company that engages in the discovery and development of RNA-modulating therapeutics for the treatment of genetic disorders. The Company's shares trade on the NASDAQ Stock Exchange (the "NASDAQ") under the symbol "RNA."

46.     Collectively, Prosensa, the Individual Defendants, and the Underwriter Defendants are referred to herein as "Defendants."

**SUBSTANTIVE ALLEGATIONS**

**Background**

47.     Prosensa, which started operations in 2002, is a biotechnology company based in

Leiden, Netherlands.   The Company works closely with Leiden University Medical Center

("LUMC"), also located in Leiden, Netherlands.   Prosensa is engaged in the discovery and

development of ribonucleic acid-modulating therapeutics for the treatment of genetic disorders.

Prosensa focuses on rare neuromuscular and neurodegenerative disorders with a large unmet

medical need, including DMD, myotonic dystrophy, and Huntington's disease.   In 2003,

Prosensa entered into an exclusive licensing agreement with LUMC for LUMC's proprietary

RNA modulation exon-skipping technology for use in developing treatments for, *inter alia*,

DMD.

48.     DMD is a rare neuromuscular disorder that causes progressive muscle loss,

leading to severe disability and premature death.   It is caused by a genetic mutation that causes

the dystrophin gene to make inadequate amounts of dystrophin.   Dystrophin is a protein that

plays a key structural role in muscle fiber function and is needed to keep muscles intact.   The

disorder occurs in about one in every 3,500 boys worldwide.

49.     DMD primarily affects boys and young men, and the symptoms typically begin to

appear between the ages of one and four years old. The main sign of DMD is muscle weakness

that worsens over time.   Before age five, the muscles in the legs, arms, and trunk begin to

weaken.

50.     Affected children may experience developmental delays, which can include

difficulty in walking, climbing stairs, or standing from a seated position.   Most children affected

by DMD require full-time use of a wheelchair by the age of twelve.   Later in the disease's

progression, the respiratory muscles weaken requiring ventilation support.   Ultimately, the disorder impacts cardiac function, which can lead to heart failure.  DMD is universally fatal.

51.     The average life expectancy for someone diagnosed with DMD is twenty-seven years.  Currently, there are no approved disease-modifying therapies for DMD.  In the United States, European Union, and Japan alone, there are 30,000 boys and young men in the prospective DMD drug market.

52.     In 2001, Congress passed the Muscular Dystrophy CARE Act, which since that time has provided more than $400 million in funding – much of it specifically for funding DMD research.

53.      Federal backing plus the estimated $1.4 billion worldwide market for a successful DMD drug caught the attention of biotech companies.

### Prosensa's Disapersen Development

54.     Prosensa's exon-skipping[5] technology was designed to correct the genetic mutations that interfere with dystrophin expression restoring an essential function that can delay and significantly correct DMD's debilitating effects.   Prosensa had six drisapersen programs targeting various DMD populations under development at the time of the IPO.

55.     In October 2009, the Company announced its worldwide development partnership with GSK.  This development partnership gave GSK exclusive rights to develop and license Prosensa's lead product drisapersen, PRO051/GSK2402968, which was intended to treat DMD

---

[5]      Genes are divided into sections called exons and introns.  Exons are the sections of DNA that code for the protein and they are interspersed with introns (which are also referred to as "junk DNA"). The introns are cut out and discarded in the process of protein production, to leave just the exons.  The dystrophin gene is the largest gene containing seventy-nine exons which are joined together like the pieces of a puzzle.   http://www.muscular-dystrophy.org.   Exon-skipping encourages the cellular machinery to "skip over" an exon.  Small pieces of DNA called antisense oligonucleotides (AOs) or "molecular patches" are used to mask the exon that you want to skip, so that it is ignored during protein production.  If successful, exon skipping may be able to mask the symptoms of DMD.

by skipping exon 51 for the dystrophin gene.   GSK also obtained rights to the follow on compounds, including PRO044 which targets exon 44.  The GSK partnership delivered upfront payments and triggered milestone payments, one of which was received by Prosensa in October 2012 in the amount of £10 million.  A substantial portion of the milestone payments were related to drisapersen.  With a potentially lucrative collaboration agreement in place, the success of the Company rested with convincing the FDA that drisapersen was not only safe, but effective as well.

56.     Prosensa began its Phase II  placebo-controlled study of drisapersen, enrolling fifty-three DMD patients beginning in September 2010.  DEMAND-II was completed in April 2013.

57.     In April 2013, GSK and Prosensa made an abbreviated presentation of the results from the DEMAND-II study.  The companies claimed that the 53-participant, placebo controlled, 48-week trial compared two different dosing regimens of drisapersen with a placebo and found that drisapersen conferred a significant difference in walking distance compared to the placebo. Dystrophin protein levels were not reported at that time but were promised to be announced around October 2013.   However, GSK and Prosensa reported that the Phase II clinical study found a 117-foot difference between the distance walked in six minutes by those who received the drug every week and those who received a placebo.  Additionally, the companies reported that the "continuous treatment" group (which received weekly injections of drisapersen) purportedly walked farther in six minutes than those who received drisapersen on an intermittent dosing schedule.

58.     Specifically, regarding DEMAND-II, the Registration Statement noted, in pertinent part, that:

In clinical trials, drisapersen has been shown to produce dystrophin expression and have a beneficial therapeutic effect on DMD patients. A Phase II placebo-controlled study of drisapersen in 53 DMD patients was completed and demonstrated a statistically significant and clinically important difference in the primary endpoint, which was the distance walked in the six minute walk test, or 6MWD, between the placebo group and the continuous active-treatment group at a dose of 6 mg/kg/week after 24 weeks. This clinically meaningful benefit was maintained after 48 weeks of treatment, and drisapersen was well tolerated throughout the duration of this study. Preliminary results suggest that treatment with drisapersen was in general associated with increased levels of dystrophin expression when compared with pre-treatment levels.

59.   Throughout its process of developing drisapersen, Prosensa tracked the natural history of DMD closely. The natural history of a disease refers to the progression of a disease process in an individual over time, in the absence of treatment. According to the Registration Statement, "natural history data can illustrate expected rates of physical decline, which helps to put into context the effects of novel drug treatments."

60.   Specifically, with respect to the natural history of DMD, the Registration Statement states that:

The six minute walk test (6MWT) is a test that measures the distance a subject can walk in 6 minutes using a standardized corridor length and turning point at each end (the six minute walk distance or 6MWD). This test has been used in observational research studies to follow the natural history of DMD disease progression over time as subjects gradually lose the ability to walk.

61.   The Registration Statement continued, noting that:

Several key studies have demonstrated the effect of DMD on 6MWD. One study reported an average 57 meter decrease at 52 weeks from baseline in average 6MWD by boys with DMD, whereas comparable healthy boys showed an average increase in 6MWD of 13 meters. A more recent study of 113 boys reported an average decrease in 6MWD of 23 meters in the first year of observation and 65 meters in the second year. In the latter study, when grouped by age, boys below 7 years remained stable with a slight increase in average 6MWD in the first and second years, but the average 6MWD of boys over 7 declined by about 42 meters and 80 meters, respectively.

62.    The Registration Statement contained the following diagram described as a "[c]onceptual representation of 6-minute walking distance performance by DMD patients and healthy controls":



63.    The Registration Statement explained that the diagram "illustrate[d] the typical decline in 6MWD performance by boys with DMD *over age 7*" and that it demonstrated drisapersen's efficacy.  Indeed, half of the boys in the Phase II drisapersen study were under the age of seven, including some as young as five years old.  This is significant because these younger boys' baseline walking ability was relatively strong, and boys that young typically gain motor function with the passage of time through simple growth even without treatment, which means they can walk further in general.  By way of contrast, and as is more fully discussed herein, in the haste to fill the DEMAND-III clinical study, the "unfortunate" decision to relax enrollment criteria was made, allowing for the DEMAND-III clinical study to be weighted with older patients with more advanced stages of the disease, thus compromising the study from its inception.

**Prosensa Races Sarepta Therapeutics Inc. for DMD Drug Approval**

64.    Prosensa's drisapersen was not the only experimental drug designed to treat DMD through exon-skipping technology in clinical trials.  Sarepta Therapeutics Inc.'s ("Sarepta")

(formerly known as AVI BioPharma) drug, eteplirsen, was also in clinical trials at the time of Prosensa's IPO, and as acknowledged in Prosensa's Registration Statement, is the Company's key DMD competitor as both companies' lead DMD product candidates employ the same exon 51 skipping approach to treating DMD.

65.     Thus, it was vital for Prosensa's financial prospects to have drisapersen reach the market prior to eteplirsen.     Although both drisapersen and eteplirsen could be sold simultaneously in the U.S., the second to reach market would be at a significant competitive disadvantage because the first to acquire U.S. marketing approval would have the "first mover advantage."

66.     A "first mover advantage" is the competitive advantage gained by the initial significant product to enter a market segment.   Often, the "first-mover" gains a competitive advantage with a new type of drug because physicians will prescribe the first product to market to treat their patients.   After a patient has begun a new treatment plan, it is unlikely for a physician to change the patient's medication since the patient would have already adjusted to the first medication.   Thus, the "first mover advantage" would be financially beneficial to Prosensa.

67.     Additionally, the European Medicines Agency ("EMA"), which is the European equivalent to the FDA, grants market exclusivity periods for orphan drugs that receive marketing approval and are first to reach the market.   An orphan drug is a pharmaceutical product that has been developed specifically to treat a rare medical condition, and the orphan drug status can provide incentives such as market exclusivity to those who develop drugs to treat these rare diseases.

68.     In Europe, an orphan drug candidate can receive market exclusivity for ten years after EMA approval, subject to, among other things, a showing of "clinically relevant

superiority" (in efficacy, safety and/or pharmacokinetics) to other competing drugs.  Unlike in the United States, the EMA orphan market exclusivity applies in this case to drug products for the same indication (DMD) that use the same method of action (exon skipping), but can be chemically dissimilar.  Market exclusivity in Europe was critical to Prosensa because it would be the only company in Europe authorized to sell DMD-treatment drugs using the exon skipping method.  However, even if drisapersen gained EMA approval before eteplirsen, "eteplirsen could defeat drisapersen's market exclusivity in Europe by demonstrating a clinically relevant advantage."

69.    However, at the time of Prosensa's IPO, Sarepta was reporting remarkable results from its phase 2b, 12-person eteplirsen study.  Specifically, on June 19, 2013, a mere nine days before Prosensa's planned IPO, Sarepta reported continued sustained benefit on walking distance through 84 weeks of its phase 2b, 12-person eteplirsen study, stating, in relevant part that "[Sarepta] now [has] demonstrated stability of walking for over a year and a half in the original eteplirsen treatment cohort in boys who are now 11 years old on average, an age when many DMD boys have lost the ability to walk."

70.    That same day, at the Wells Fargo Securities 2013 Health Care Conference held in Boston, Massachusetts, Sarepta announced that given the positive results to date from the eteplirsen phase 2b, 12-person study, it hoped to meet with the FDA regarding the next steps for approval of eteplirsen by the end of July 2013.

71.    Further, while drisapersen use raised safety concerns with 70% of Phase II study subjects experiencing proteinuria, a sign of kidney damage, as well injection site reactions and inflammation, raising doubts regarding its long term use, eteplirsen had no such safety concerns (meaning it could be dosed in higher quantities).

72.     Eteplirsen also had a greater impact on dystrophin production than drisapersen in previous studies, thus eteplirsen was demonstrating a "clinically relevant advantage" over drisapersen.

73.     Consequently, in the months leading up to Prosensa's IPO, its key competitor was obtaining remarkable results from its own DMD drug candidate that threatened Prosensa's inside track towards control of the billion-dollar DMD drug market.

**The Registration Statement and the IPO**

74.     On or about May 24, 2013, Prosensa filed a registration statement with the SEC on Form F-1 (Registration No. 333-188855), and thereafter filed six amendments thereto, the last of which was filed on June 27, 2013.

75.     On June 27, 2013, just hours before Prosensa priced the IPO, GSK[6] announced that the FDA had verbally notified it that drisapersen had been granted "breakthrough therapy designation" for the treatment of DMD.

76.     As described by analyst John Carroll at *FierceBiotech* later that day, this designation was notable: "This is GlaxoSmithKline's first Breakthrough Therapy designation, putting the pharma giant in some exclusive company.   J&J ($JNJ), Pfizer ($PFE), Merck ($MRK) and others have notched BTD successes – out of a total of 17 – in recent months."   It was also observed that "[t]he news [was] also a positive for Prosensa, the Dutch biotech which licensed the drug out to GSK," with *FierceBiotech* stating in pertinent part that:

> Pushed by lawmakers, FDA officials have been repeatedly vowing to provide an ***open door for development teams working on these BTDs.  The regulators say they'll work with developers every step of the way, reviewing trial designs, data, drug names--everything that can help speed these therapies to the market***.

---

[6]     In connection with the IPO, GSK agreed to purchase 461,538 ordinary shares at the offering price.

Breakthrough boasting rights can be particularly important to GSK *as Sarepta has grabbed investors' attention with some impressive midstage data from a tiny trial. Sarepta has been trying to persuade the FDA to grant an accelerated approval on eteplirsen, which would allow them to beat GSK's therapy to the market.* The biotech, though, says it has not applied for breakthrough drug status.

Sarepta's shares were down about 5% this morning.

77.     Following the "breakthrough therapy designation," Prosensa amended the IPO Registration Statement that day to state that: "[b]reakthrough therapy designation is an FDA program intended to facilitate and expedite development and review of new drugs to address unmet medical need in the treatment of serious or life-threatening condition." That same day, the SEC declared the Company's Registration Statement effective.

78.     On June 27, 2013, the Company priced the IPO, which closed on or around July 8, 2013. Prosensa's IPO was a success as the Company sold more than 6.9 million ordinary shares (including 900,000 ordinary shares pursuant to overallotment options issued to the Company's underwriters) to the public for $13 per share – at the top end of the price range – generating net proceeds of $89.7 million. According to the Company, Prosensa intended to use the proceeds from the IPO to fund its current DMD development portfolio, its early-stage DMD discovery work and its DMD-support projects, to fund other non-DMD projects, and for working capital and general corporate purposes.

79.     Indeed, as *FierceBiotech* noted in its updated June 28, 2013 report, Prosensa picked an opportune day to price its IPO:

> *Prosensa picked the right day to price its IPO.* The Dutch biotech rang up the offering at $13 a share, *at the top of the range*, raising $78 million *after bumping the number of shares on offer to 6 million*. And after the stock ($RNA) started trading on Nasdaq this morning, the price shot straight up to $20.
>
> *Just hours before the pricing, GlaxoSmithKline ($GSK) rushed out a release announcing that the FDA had provided a verbal confirmation that it is providing "breakthrough drug" status for drisapersen,* the Duchenne muscular dystrophy drug that was licensed from Prosensa . . .

(Emphasis added.)

### The Registration Statement Contained Materially False and/or Misleading Statements and/or Omitted Material Information Required to be Stated Therein

80.     The Registration Statement issued in connection with the IPO contained numerous materially false and/or misleading facts, omitted to state other facts necessary to make the statements made not misleading, and was otherwise not prepared in accordance with the governing rules and regulations.

81.     With respect to the Phase III clinical study the Registration Statement stated, in pertinent part, as follows:

> A pivotal Phase III study of drisapersen was initiated in December 2010, **and results are expected in the fourth quarter of 2013**.  This study is a randomized, **double-blind and placebo-controlled trial**, assessing drisapersen at a dose of 6 mg/kg/week in 186 boys.  The primary endpoint is the 6MWD at 48 weeks.

82.     The Registration Statement also stated that ut was "ongoing" and that it included "boys over five years of age."

83.     The statements concerning Phase III testing referenced in ¶¶81-82 were false and misleading and/or omitted to state other facts necessary to make the statements therein made not misleading.

84.     The Registration Statement failed to disclose that the DEMAND-II study had used a strict enrollment criteria intended to enroll a higher performing patient population and that the Company had substantially relaxed the enrollment criteria for the DEMAND-III study in an effort to expedite the DEMAND-III trial in a risky effort to reach the marketplace prior to Sarepta's eteplirsen.  For example, the DEMAND-II study (36m 6MWD benefit) only enrolled boys capable of standing up from the floor in seven seconds or less, whereas the DEMAND-III study had no maximum time for standing up.

85.     Thus, the Registration Statement failed to disclose that DEMAND-III study was populated with older, lower performing patients suffering from more advanced stages of DMD, and that the study failed to address the diseases natural history resulting in decreased likelihood of regulatory approval for the drug.

86.     The Registration Statement further failed to disclose that in order to expedite the enrollment and completion of the DEMAND-III clinical study, the Company utilized varied locations and new testing sites, leading to unfamiliarity with study protocol and inconsistent application of study protocol.

87.     Moreover, the Registration Statement failed to disclose, *inter alia*, that due to the significantly different patient populations in the DEMAND-II and DEMAND-III studies, the varied locations of the two clinical studies, and the inconsistent application of study protocol, comparisons of the two clinical studies would be rendered unreliable, compromising the ability to advance the approval prospects of drisapersen.

88.     In light of the forgoing, Defendants lacked a reasonable basis for their positive statements concerning the development status of drisapersen, the DEMAND-III study, the prospects for drisapersen's regulatory approval, and drisapersen's future commercial prospects.

**Post-IPO Disclosures**

89.     On September 20, 2013 (and before the market opened), GSK and Prosensa issued a joint press release announcing that "GSK's Phase III clinical study of drisapersen . . . did not meet the primary endpoint of a statistically significant improvement in the 6 Minute Walking Distance (6MWD) test compared to placebo" in the "186 boys . . . randomised to th[e] double-blind, placebo-controlled study . . . over 48 weeks," stating "[t]here was no treatment difference in key secondary assessments of motor function: 10-meter walk/run test, 4-stair climb and North Star Ambulatory Assessment."

90.     During a conference call that followed, Prosensa's management explained that the treatment arm that received the placebo decreased fifty-three meters on the 6MWD tests, while the treatment arm that received the drug decreased by forty-two meters – only a ten meter difference.   Moreover, the Company also explained that of the twenty-one boys who lost ambulation altogether during the study, six were from the placebo group and fifteen were from the drug treatment group, "roughly 10% in each group."

91.     Prosensa's management also explained that it could take weeks, if not months to analyze the data, and thus could not offer guidance in regard to what its next step would be. Prosensa's management tried to emphasize that there were ongoing studies of other drisapersen derivatives that might be successful, encouraging the investment community to believe there may be some commercial value left in the drug.

92.     When asked by an analyst to explain the different outcomes between the Phase II (DEMAND-II) and the Phase III (DEMAND-III) efficacy outcomes, Defendant Schikan admitted that the Phase II study included *"a younger patient population with better performance."*   Indeed, Defendant Schikan explained that the average age in the Phase III testing in the treatment group that received the drug *was 8.3 years old versus approximately 7 years old in the Phase II testing.*   And later in the call Defendant Schikan conceded that the Phase II study was "*designed to recruit to a younger age . . . a high performance group of boys*. So the ages were less there."

93.     Before the opening of the market on September 24, 2013, J.P. Morgan issued an analyst report downgrading Prosensa from an overweight rating to a neutral rating while stripping its price target down from $35 *to just $6.50*.   The impetus for the downgrade was the failure of drisapersen to meet its primary and secondary endpoints in a late-stage trial.

According to the J.P. Morgan analyst report, the lack of positive data would make the drug difficult, if not impossible, for the FDA to approve.  The analyst report also noted the potential that GSK might simply walk away and provide no additional funding for future studies of drisapersen, leaving Prosensa with $117 million in dwindling cash and no FDA-approved drugs.

94.     The September 24, 2013 J.P. Morgan analyst report expressed dismay with respect to the overly broad patient enrollment of the DEMAND-III study and the "unfortunate" decision to relax the enrollment criteria for the DEMAND-III study.

What went wrong with DEMAND-III?

Ahead of full data presentation, we believe the most likely explanation for the failure of DEMAND-III, beyond the relative weakness of Drisapersen efficacy, *is the overly broad patient enrollment.*

*The DEMAND-II study (36m 6MWD benefit) only enrolled boys capable of standing up from the floor in 7 seconds or less, a fairly strict enrollment criteria. The DEMAND-V study only enrolled boys who could stand up in 15 seconds or less, a broader population, which correlated with a smaller benefit (27m).*

*The DEMAND-III study had no maximum time for standing up, and hence will likely have enrolled boys whose disease was even more advanced than DEMAND-V, which could be a factor in the far smaller benefit (10m).*

*We believe the (unfortunate) decision to relax the enrollment criteria was made so as to enable quicker enrollment for the PIII study, with this decision likely to have been influenced by the race against competitor Sarepta. We believe this decision may also have been taken so as to potentially generate a broader label once, approved, which could have increased Drisapersen's commercial potential.*

*This enrollment criteria decision is unfortunate, as patients with more advanced disease are likely to show a smaller benefit from treatment, as therapies like Drisapersen may be able to stabilise disease worsening, but may not be able to reverse existing damage.* This effect is likely to be particularly pronounced on 6MWD measurements, as a patient who entirely loses the ability to walk during the study (i.e. become non-ambulant) is deemed to have worsened by their entire baseline 6MWD (~400m), whereas a patient who experiences material therapeutic benefit is still only likely to derive a c.40m benefit. Hence multiple responders are needed to offset one boy becoming non-ambulant.

Prosensa have disclosed that 10% of patients in the placebo arm became nonambulant, vs. 12% of patients on Drisapersen. Whilst this could point to poor stratification of sicker patients at baseline, it could also simply be that Drisapersen isn't very efficacious.

(Emphasis added.)

95.     Then, on September 24, 2013, *Barron's* published a report entitled "Prosensa Drug Misses Primary Endpoint – Wedbush downgraded the biotech to Neutral from Outperform," which summarized the Wedbush downgrade in pertinent part as follows:

Preliminary analysis of Phase III results discussed on Prosensa's (ticker: RNA) call suggest that the anticipated causes for concern with this trial did not result in its failure, ***which we believe call into question drisapersen's [Duchenne muscular dystrophy (DMD)] therapeutic activity***.

***Results from the trial make it highly unlikely, in our opinion, that drisapersen will be approved for the treatment of boys amenable to skipping exon-51 based upon this data set. We note, however, that strong signals of efficacy in previous studies, in particular the Phase I/II extension study over three years suggest that this drug may have activity in a subset of patients. While the numbers of patients in the ongoing Phase 1 extension study of drisapersen is small, it is highly unlikely that they could have enrolled patients with DMD that could show preservation of ambulation over three years, as has been demonstrated in data to date***.

The next steps going forward for Prosensa and GlaxoSmithKline (GSK) remain further analysis of the data, which is expected to take months. We believe given all of the results to date, that Prosensa and GlaxoSmithKline may have to run an additional study in a subset of what appear to be responder patients, if that subset can even be identified.

***We are downgrading Prosensa to Neutral from Outperform and lowering our price target to $7 from $50, given discouraging Phase III data and uncertainty in value drivers going forward***. We arrive at our $7 price target by taking $7 a share for the valuation for Prosensa's intellectual property/technology, which is based upon an eight times multiple to net revenue derived from estimated 10% royalties on anticipated peak about $600 million in sales on a to-be-licensed exon-51-skipping drug in the EU, discounted 35% annually. ***This represents about 10% of the value we previously assigned to drisapersen in the EU and may also be a reasonable estimate of the market size should a to-be-identified responder subpopulation emerge from the data***.

(Emphasis added.)

96.     In addition to J.P. Morgan and Wedbush, Citigroup and Leerink Swann also reacted to the disappointing drisapersen results. Citigroup downgraded Prosensa and lowered its price target for its shares to $8 from $38, stating that it saw increased likelihood that GSK would return its rights of the drug to Prosensa.  Likewise, Leerink Swann lowerededits price target for Prosensa to $11 citing the disappointing drisapersen data.

97.     As the market interpreted the data provided by GSK and Prosensa (including the additional information posted on GSK's website as directed in Prosensa's September 20, 2013 press release), the price of Prosensa's ordinary shares plummeted $16.86 per share, or nearly 70%, on unusually heavy trading volume from its close of $24.00 per share on September 19, 2013 to close at $7.14 per share on September 20, 2013.  The Company's stock declined nearly an additional 10% on September 24, 2013 on the downgrade by J.P. Morgan and others, to close at $6.24 per share.

98.     On January 13, 2014, more than four years after GSK and Prosensa's collaboration began, the two companies parted ways, with Prosensa regaining the rights to drisapersen and retaining the rights to all other programs for the treatment of DMD.

99.     On June 4, 2014, Prosensa held a regulatory update conference call on drisapersen, during which CEO Schikan admitted, in pertinent part, that:

> The hypothesis that has emerged in our assessment of the data is that it is possible that the *Phase III trial may have failed the drug*, rather than the drug failing the trial. *This is apparent when comparing the baseline characteristics of the boys in the Phase III trial to those boys in the previous Phase II trials.*
>
> Boys in the Phase III trial had a lower baseline six-minute walk test, performed worse in all tests of muscle function *and were generally older, which is correlated with increased disease progression.*  The FDA finds that it's plausible, but not necessarily conclusive that these hypotheses might have led to lack of statistically significant findings in the Phase III study in contrast to the nominal findings in earlier studies.

100.   On November 24, 2014, before the market opened, Prosensa and BioMarin Pharmaceutical Inc. ("BioMarin") announced that they had entered into a definitive agreement pursuant to which BioMarin would offer to purchase all of the outstanding shares of Prosensa for $17.75 per share, representing a total up front consideration of $680 million (the "Acquisition"). Later that day, on November 24, 2014, BioMartin held a conference call with investors to discuss the Prosensa Acquisition.  With respect to Prosensa's DEMAND-III clinical trial, Henry Fuchs ("Fuchs"), Executive Vice President and Chief Medical Officer of BioMarin stated that:

> So turning to the Phase III clinical trial and how its result differed substantially from earlier randomized Phase II trials. We note that ***the eligibility characteristics of the Phase III population were substantially widened for the conduct of Phase III.*** In particular, an important patient prognostic factor is patient's ability to rise from floor. Ordinarily, Duchenne patients when well preserved, can rise from the floor in under seven seconds. And in the Phase II studies . . . their rise from the floor times were, in general, around five seconds or one divided by 0.2.
>
> With the widening of the eligibility criteria from a seven-second rise from floor to a 15-second rise from floor, you can see that the study population accrued older patients, patients with a longer time since their recent diagnosis, a worse rise from floor parameter, worse ability to climb stairs, shorter six-minute walk test distance at baseline and weaker overall muscle strengths. ***So we believe that the patients in the randomized Phase III trial were older and had more advanced disease.***

101.   Fuchs continued, noting that:

> New sites were recruited in the Phase III to support global adoption of medicine. ***If you evaluate the efficacy data obtained from those sites that participated in the Phase II trial who also participated in the Phase III trial***, there's an approximately 50-meter improvement in six-minute walk distance . . .
>
> ***
>
> ***Finally, corticosteroid use at new sites was not consistently a standard of care*** and approximately 30% of patients had recently started corticosteroids as part of the run-in phase for the randomized Phase III trial.

**In the year following the IPO, Prosena's Stock Price Declined More Than 30%**

102.    At the time of the filing of this action, on July 18, 2014, Prosensa stock was trading at approximately $9.00 per share – *representing a more than 30% decline from the IPO price*.

## CLASS ACTION ALLEGATIONS

103.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Prosensa ordinary shares and/or securities pursuant and/or traceable to the Registration Statement issued and/or utilized in connection with the IPO, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants herein, members of the immediate families of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any Defendant, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

104.    The members of the Class are so numerous that joinder of all members is impracticable.  Prosensa offered 6.9 million ordinary shares in the IPO and is actively traded on the NASDAQ. While the exact number of Class members are unknown to Plaintiffs at this time, Plaintiffs believe that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Prosensa or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

105.    Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of

federal law that is complained of herein.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

106.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

107.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Sections 11 and 15 of the Securities Act were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public in the Registration Statement issued by Prosensa in connection with the IPO negligently omitted and/or misrepresented material facts about the business and prospects of Prosensa; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

108.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violations of Section 11 of the Securities Act
### (Against All Defendants)

109.    Plaintiffs repeat and reallege each and every allegation contained above. This count is predicated upon Defendants' strict liability for making false and materially misleading statements in the Registration Statement.

110.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

111.    The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary in order to make the statements made not misleading, and omitted to state material facts required to be stated therein. Among others, the Registration Statement misrepresented or failed to disclose information about the results and designs of the various studies, including among others, information related to the overall safety of drisapersen and differences between the populations and enrollment criteria of the studies.

112.    Prosensa is the registrant for the IPO. Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

113.    As issuer of the shares, Prosensa is strictly liable to Plaintiff and the Class for any misstatements and omissions.

114.    None of Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

115.    By reason of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

116.    Plaintiffs acquired Prosensa common stock pursuant and/or traceable to the Registration Statement for the IPO.

117.    Plaintiffs and the Class have sustained damages. The value of Prosensa common stock has declined substantially subsequent to and due to Defendants' violations.

118.    At the time of their purchases of Prosensa, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts.  Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiffs filed this complaint.  Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiffs filed this complaint.

## COUNT II

**For Violations of Section 15 of the Securities Act**
**(Against the Individual Defendants)**

119.    Plaintiffs repeat and reallege each and every allegation contained above.

120.    This Count is brought pursuant to Section 15 of the Securities Act against the Individual Defendants.

121.    Each of the Individual Defendants acted as controlling persons of Prosensa within the meaning of Section 15 of the Securities Act by virtue of his position as a director and/or senior officer of Prosensa.  By reason of their senior management positions and/or directorships at the Company, as alleged above, the Individual Defendants, individually and acting pursuant to a common plan, had the power to influence and exercised the same to cause Prosensa to engage

in the conduct complained of herein.  Further, the Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiffs and the Class.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 15 of the Securities Act.

122.    Each of the Individual Defendants was a culpable participant in the violations of Section 11 of the Securities Act alleged in Count I above, based on their having signed the IPO Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

123.    By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiffs and the Class for damages suffered.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the other Class members their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees, experts' fees, and other costs and disbursements; and

D.    Awarding such equitable, injunctive, or other relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  December 29, 2014

**GLANCY BINKOW & GOLDBERG LLP**

By:  *s/ Robert V. Prongay*
LIONEL Z. GLANCY
ROBERT V. PRONGAY (*Pro Hac Vice*)
CASEY E. SADLER
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

-and-

BRIAN P. MURRAY (BM9554)
GREGORY LINKH (GL0477)
122 E 42nd Street, Suite 2920
New York, New York 10168
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
Email: glinkh@glancylaw.com

**JOHNSON & WEAVER, LLP**
FRANK J. JOHNSON
110 West "A" Street, Suite 750
San Diego, CA 92101
Telephone: 619/230-0063
619/255-1856  (fax)

-and-

W. SCOTT HOLLEMAN
99 Madison Avenue, 5th Floor
New York, New York 10016
Telephone: (212) 802-1486
Facsimile: (212) 602-1592

-and-

MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, GA 30064
Telephone: (770) 200-3104

**LAW OFFICES OF HOWARD G. SMITH**
HOWARD G. SMITH
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Counsel for Plaintiffs*

**PROOF OF SERVICE BY ELECTRONIC POSTING PURSUANT TO SOUTHERN
DISTRICT OF NEW YORK ECF AND LOCAL RULES AND BY MAIL
ON ALL KNOWN NON-REGISTERED PARTIES**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old.

On December 29, 2014, I served true and correct copies of **AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**, by posting the
document electronically to the ECF website of the United States District Court for the Southern
District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the
foregoing is true and correct.  Executed this 29th day of December, 2014, at Los Angeles, California.

                                        *s/ Robert V. Prongay*
                                        Robert V. Prongay

## Mailing Information for a Case 1:14-cv-05450-NRB

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Lionel Z. Glancy**
  lglancy@glancylaw.com,mmgoldberg@glancylaw.com,csadler@glancylaw.com,pbinkow@glancylaw.com,info@glancylaw.com,rprongay@glancylaw.com

- **William Scott Holleman**
  ScottH@johnsonandweaver.com,paralegal@johnsonandweaver.com,frankj@johnsonandweaver.com,michaelf@johnsonandweaver.com

- **Frank J. Johnson , Jr**
  frankj@johnsonandweaver.com,paralegal@johnsonandweaver.com,shawnf@johnsonandweaver.com,scotth@johnsonandweaver.com,michaelf@johnsonandweaver.com

- **Peter Eric Kazanoff**
  pkazanoff@stblaw.com,managingclerk@stblaw.com

- **Gregory Bradley Linkh**
  glinkh@glancylaw.com

- **Brian Philip Murray**
  bmurray@glancylaw.com

- **Edmund Polubinski , III**
  epolub@dpw.com,ecf.ct.papers@dpw.com,stefani.johnson@davispolk.com

- **Lawrence Jay Portnoy**
  portnoy@dpw.com,Bryan.McArdle@davispolk.com,ecf.ct.papers@davispolk.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,echang@glancylaw.com

- **Joshua Mark Slocum**
  jslocum@stblaw.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Michael          Goldberg
Glancy Binkow & Goldberg, LLP (CA)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067

Howard           G. Smith
Smith & Smith
3070 Bristol Pike
Bensalem, PA 19020
```